UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

CENTERPOINT PROPERTIES  )
TRUST,       )
          )
    Plaintiff,   )
          )
  v.       )   2:13-cv-00175-JAW
          )
KARL S. NORBERG, et al.,  )
          )
    Defendants.  )

**ORDER GRANTING THE MOTION OF INTERVENOR UNITED STATES OF AMERICA TO DISSOLVE ATTACHMENT AND ORDERING PLAINTIFF CENTERPOINT TO FILE *KEY BANK* AFFIDAVITS**

Centerpoint Properties (Centerpoint) prevailed in a lawsuit against Karl Norberg and Pamela Gleichman in Illinois, and attempted to enforce that judgment against property owned by them in Maine. Centerpoint used Maine's procedure for prejudgment attachment to freeze funds in a bank account owned by Mr. Norberg and Ms. Gleichman. However, the funds in that account were a statutorily-mandated reserve for a housing development owned by Mr. Norberg and Ms. Gleichman, and funded in part by the United States Department of Agriculture. The United States (Government) intervened on behalf of the United States Department of Agriculture and moved to dissolve the attachment, arguing that the funds are actually "federal funds" not yet spent for their statutory purpose. The Court agrees; the funds came from the federal government, they were given to serve an important federal interest, and the federal government retains detailed and

pervasive control over them. Under these circumstances, Centerpoint cannot seize the funds. The Court grants the United States' motion to dissolve attachment.

## I.    LEGAL STANDARD

"A party to a civil action . . . may move for . . . dissolution . . . of attachment approved ex parte, within the District of Maine in accordance with state law and procedure as would be applicable had the action been maintained in the courts of the State of Maine." D. ME. LOC. R. 64. In a Maine state court, the party seeking attachment via trustee process must show

> that it is more likely than not that the plaintiff will recover judgment, including interest and costs, in an aggregate sum equal to or greater than the amount of the trustee process and any insurance, bond, or other security, and any property or credits attached by writ of attachment or by other trustee process shown by the defendant to be available to satisfy the judgment.

ME. R. CIV. P. 4B(c).

Once the court has ordered trustee process,

> any person having an interest in goods or credits that have been attached on trustee process pursuant to an ex parte order . . . may . . . move the dissolution . . . of the trustee process, and in that event the court shall proceed to hear . . . such motion . . . . At such hearing the plaintiff shall have the burden of justifying any finding in the ex parte order that the moving party has challenged by affidavit.

ME. R. CIV. P. 4B(j).

Under Federal Rule of Civil Procedure 55(b)(2), a court may enter a judgment against a defaulted party upon application by the other party. However, if the defaulted party has entered an appearance, it is entitled to "written notice of the application for judgment at least 7 days prior to the hearing on such application." *Id.* "Although appearance in an action typically involves some presentation or

submission to the court . . . a defaulting party 'has appeared' for Rule 55 purposes if it has indicated to the moving party a clear purpose to defend the suit." *Key Bank v. Tablecloth Textile Co.,* 74 F.3d 349, 353 (1st Cir. 1996) (internal quotations and citations omitted).

## II. FACTS

On or about November 15, 1983 and July 1, 2008, Mr. Norberg and Ms. Gleichman obtained financing under the Consolidated Farm and Rural Development Act from the Rural Housing Service (RHS) of the United States Department of Agriculture (USDA). *Second Decl. of Virginia Manuel* (ECF No. 18) (Oct. 23. 2013) (*Manuel Second Decl.*). They obtained this financing to fund the operation and maintenance of Elsemore Estates, a multi-family housing development in Dixfield, Maine. *Id.* ¶¶ 3-4. As a condition of making those loans, USDA regulations required Mr. Norberg and Ms. Gleichman to open a reserve account to pay for maintenance of and capital improvements to Elsemore Estates. *Manuel Second Decl.* ¶ 5; *Manuel Second Decl.* Attach. 1 *Loan Agreement*, ¶ 5 (ECF No. 18) (July 1, 2008) (*Loan Agreement*); 7 C.F.R. § 3560.306(a) (2008). Reserve accounts are "'supervised accounts that require [RHS] countersignatures on all withdrawals.'" *Manuel Second Decl.* ¶ 6 (quoting 7 C.F.R. § 3560.306(e)(2)).

On August 8, 2006, Mr. Norberg opened a reserve account at TD Bank to pay for maintenance of and capital improvements to Elsemore Estates. *Manuel Second Decl.* ¶ 7. That account was numbered 721135392 and was opened as a new, non-personal account for the benefit of Elsemore Estates. *Id.* ¶¶ 7-8; *Manuel Second*

*Decl.* Attach. 2, at 2 (ECF No. 18) (Aug. 8, 2006) (*TD Bank Documents*). The account was opened by "Karl S. Norberg DBA Elsemore Est Replacement Res & USDA"; the phrase "Elsemore Est Replacement Res" stands for "Elsemore Estates Replacement Reserve." *TD Bank Documents* at 2; *Manuel Second Decl.* ¶ 9. The term "replacement" identifies the purpose of the funds in the Reserve Account as financing the replacement or repair of capital items at Elsemore Estates. *Manuel Second Decl.* ¶ 9. The account terms specifically require two signatures for any withdrawal from the reserve account, one of which must be a "USDA Authorized Signer." *TD Bank Documents* at 1, 4.

The 2008 loan agreement between the USDA and the Defendants requires that withdrawal and use of the funds in the reserve account must be in accordance with 7 C.F.R. pt. 3560 or any successor regulation. *Loan Agreement* § 5.b. Under those regulations, the funds deposited in the Reserve Account may only be used for major capital improvements to Elsemore Estates, certain operating expenses for Elsemore Estates, and other purposes that in RHS's judgment will "promote the loan purposes, strengthen the security or facilitate, improve, or maintain the housing and the orderly collection of the loan without jeopardizing the loan or impairing the adequacy of the security." *Manuel Second Decl.* ¶ 13; 7 C.F.R. § 3560.306(h)(4). In some limited instances, portions of accrued interest and excess funds may be withdrawn by the Defendants for other purposes, but only with express consent from USDA. *Manuel Second Decl.* ¶¶ 13-14.

Federal regulations also govern deposits into supervised bank accounts for USDA-funded housing projects, such as the reserve account in this case. *Manuel Second Decl.* ¶ 17 (citing 7 C.F.R. § 1902.9(b)). The same regulations contain requirements for tracking deposits and for ensuring that all parties—the borrower, the federal government, and the bank—are well aware of the restrictions contained in the deposit agreement with the bank when deposits are made into that account. *Id.*

The reserve account is funded with income from the Elsemore Estates housing project. *Id.* ¶ 18. There are two sources of funds: (1) payments from the federal government for rental assistance, for the benefit of the tenants; and (2) rent, from the tenants directly. *Id.* The Defendants placed none of their personal funds into the reserve account. *Id.* ¶ 18.

The Defendants granted the USDA a security interest in the reserve account in return for the loan of July 1, 2008. *Manuel Second Decl.* Attach. 3 *Security Agreement*, at 2 (ECF No. 18) (July 1, 2008). The federal government also has a valid and properly recorded mortgage interest in the land and improvements that compose Elsemore Estates. *Manuel Second Decl.* Attach. 4 *Real Estate Mortgage for Maine* (ECF No. 18) (June 24, 2008).

On March 27, 2013, Centerpoint filed a complaint in Penobscot County Superior Court, Docket No. BANSC-cv-2013-00055, *Decl. Upon Removal of Action* Attach. 18 *Compl.* (ECF No. 4), seeking to domesticate an Illinois judgment against Mr. Norberg and Ms. Gleichman in the amount of $76,298,666.00. *Decl. Upon*

*Removal of Action* Attach. 20 *Mem. of J.* (ECF No. 4) (Jan. 25, 2013). Along with the complaint, Centerpoint filed a motion for ex parte attachment and trustee process in the amount of $78,000,000. *Decl. Upon Removal of Action* Attach. 11 *Mot. for Ex Parte Attach. and Trustee Process* (ECF No. 4). The Superior Court granted that motion on the same day. *Decl. Upon Removal of Action* Attach. 10 *Order on Mot. for Ex Parte and Trustee Process* (ECF No. 4) (Mar. 27, 2013) (*Trustee Process Order*).

Centerpoint immediately served a Summons to Trustee on TD Bank, N.A. *Decl. Upon Removal of Action* Attach. 8 *Summons to Trustee* (ECF No. 4) (Mar. 27, 2013). On March 29, 2013, the Bank "garnished" the contents of account number 721135392, totaling $90,409.87. *Notice of Removal of Civil Action* Attach. 1 (ECF No. 1).[1] On April 12, 2013, the Bank answered the Summons to Trustee, indicating that it held accounts in the Defendants' names totaling that same amount. *Decl. Upon Removal of Action* Attach. 3 *Trustee's Answer* (ECF No. 4).

"Important rehabilitation work" involving "much-needed repairs to the housing development" was scheduled to begin on Elsemore Estates in April 2013. *Manuel Second Decl.* ¶ 25. This rehabilitation work was to be paid for by the funds in the Elsemore Estates reserve account. *Id.* ¶ 26. However, TD Bank's attachment of the reserve account funds froze RHS's resources to pay its rehabilitation

---

[1] As the United States observes, it "seeks to dissolve the attachment of funds in TD Bank Account # 721135392 ordered by the Penobscot County Superior Court. TD Bank states that it has garnished that account . . . . Inasmuch as the funds in the account are being held in escrow, . . . it appears that TD Bank's action should be viewed as an attachment rather than a garnishment." *Intervenor's Mot.* at 4 n.1 (citing *Notice of Removal of Civil Action* Attach. 1, at 2 (ECF No. 1)).

contractor. *Id.* ¶ 27. As a result, the rehabilitation contractor terminated work and left the job site. *Id.* ¶ 28. Currently, the remaining rehabilitation work has been suspended until TD Bank's attachment of the reserve account funds is lifted and those funds are fully restored to be used as intended by RHS. *Id.* ¶ 29. The state court's order for trustee process and TD Bank's resultant attachment of the reserve account funds have had a "major adverse impact" on RHS's ability to complete the rehabilitation work at Elsemore Estates. *Id.* ¶ 30. In RHS's view, it is therefore unable to "assure safe, decent, sanitary housing for the tenants," undermining its "mission under the Consolidated Farm and Rural Development Act." *Id.*

The United States removed the case to this Court on May 8, 2013. *Notice of Removal of Civil Action* (ECF No. 1). The Government moved to intervene as an interested party under Federal Rule of Civil Procedure 24(a) on July 17, 2013. *Mot. to Intervene* (ECF No. 6). The Magistrate Judge granted that motion on Aug. 22, 2013. *Order on Mot. to Intervene* (ECF No. 7). Meanwhile, on September 19, 2013, Centerpoint moved for an entry of default against the Defendants, who had still not filed a responsive pleading or otherwise appeared. *Request for Entry of Default* (ECF No. 10). The clerk of court entered the default on the same day, and Centerpoint moved to reduce the default to a judgment on September 23, 2013. *Pl.'s Req. for Entry of Default J.* (ECF No. 12).

The Government moved to dissolve TD Bank's attachment of the funds in the reserve account on October 23, 2013. *Mot. to Dissolve Attach.* (ECF No. 17) (*Intervenor's Mot.*). Centerpoint opposed that motion on November 13, 2013.

*Objection to Intervenor's Mot. to Dissolve Attach.* (ECF No. 19) (*Pl.'s Opp'n.*).  The Government responded to the opposition on November 26, 2013.  *Reply Mem. in Support of Intervenor's Mot. to Dissolve Attach.* (ECF No. 20) (*Intervenor's Reply*).

## III.   THE MOTION TO DISSOLVE ATTACHMENT

### A.   Position of the Parties

#### 1.   The Government

The Government argues that its sovereign immunity prevents a judgment creditor from attaching or garnishing federal property without the Government's consent.  *Intervenor's Mot.* at 6.  "[V]arious factors and principles," it contends, determine whether funds in the possession of an entity outside the federal government are, in fact, federal property.  *Id.*  For instance, if a federal grant imposes "minute controls" on the use of the funds, the Government claims that they are federal property.  *Id.* (citing *In re Joliet-Will Cnty. Cmty. Action Agency*, 847 F.2d 430, 432 (7th Cir. 1988) and *Neukirchen v. Wood Cnty. Head Start, Inc.*, 53 F.3d 809, 812 (7th Cir. 1995)).  Likewise, if one possessing grant money "has little or no discretion over its use," the Government contends that the money is federal property.  *Id.* at 7 (citing *Neukirchen*, 53 F.3d at 813).  Furthermore, it argues, if the federal government has a beneficial interest in funds, then they are deemed to be federal funds, even if they are no longer in the possession of the federal government. *Id.* (citing *Joliet-Will*, 847 F.2d at 432-33).  Similarly, in the Government's view, federal funds are not subject to garnishment proceedings until they have been used for the purposes for which they were appropriated.  *Id.* (citing *Palmiter v. Action, Inc.*, 733 F.2d 1244, 1247 n.4 (7th Cir. 1984)).  Finally, the Government places the

burden of persuasion on the judgment creditor to prove that the funds it seeks to attach or garnish are not federal funds or have been "finally expended for their statutory purpose." *Id.* (citing *Palmiter*, 733 F.2d at 1244; *Fulgham v. Hous. Auth. of Baltimore City*, Civil No. WDQ–11–0579, 2011 WL 4566447, at *4 (D. Md. Sept. 29, 2011) (unreported)).

Turning to the funds in Account # 721135392, the Government argues that they were subject to "minute federal control" because federal regulations provide detailed limits on the purposes for which they can be spent, and because RHS exercises "absolute control over withdrawal" of the funds. *Id.* at 7-8. The Government also contends that RHS holds an "express security interest" in the funds by virtue of the security agreement for the July 1, 2008 loan. *Id.* at 8. Finally, the Government argues, the funds in Account # 721135392 are funds of federal origin, not yet expended for their statutorily-authorized purpose, because a portion of them came from payments by the federal government. *Id.* (citing *Palmiter*, 733 F.2d at 1248 and *United States Dep't of Hous. & Urban Dev. V. K. Capolino Constr. Corp.*, No. 01 Civ. 390(JGK), 2001 WL 487436, at *5-6 (S.D.N.Y. May 7, 2001)).

As a fallback, the Government argues that the funds in Account # 721135392 are not subject to attachment because they cannot legally be used to satisfy the judgment against Mr. Norberg and Ms. Gleichman. *Id.* at 10 (citing *Pease v. Jasper Wyman & Son*, 2004 ME 29, ¶ 7, 845 A.2d 552, and *McInnes v. McKay*, 141 A. 699, 702 (Me. 1928)). This is so, the Government suggests, because the "garnishor

stands in the shoes of the debtor and cannot assert greater rights over the funds at issue than could the debtor," *id.* (citing *Amoco Oil Co. v. Se. Mail Transp., Inc.* 628 F. Supp. 37, 38 (M.D. Fla. 1985)). Here, the funds in Account # 721135392 cannot be used for any purpose other than those enumerated in the regulations and the loan agreement, making them invalid for use in satisfying an unrelated debt of the Defendants. *Id.*

As a second fallback, the Government argues that the Penobscot County Superior Court erred in finding

> it more likely than not that in this action . . . there is a clear danger that the Defendants if notified in advance of attachment of their property, will make the property unavailable to satisfy any judgment which might be rendered in this case and . . . will dissipate any funds in the hands of [TD Bank] and otherwise make the funds unavailable to satisfy any judgment in this case.

*Id.* at 11 (quoting *Trustee Process Order* at 1). This is an erroneous finding, the Government urges, because the Defendants could not have withdrawn the funds without the co-signature of a designated RHS representative—which, presumably, would not have been forthcoming. *Id.*

### 2. Centerpoint

Centerpoint disagrees that funds derived from rental assistance and direct rent payments are "federal funds" for the purpose of barring attachment. *Pl.'s Opp'n* at 2-9. It views the *Capolino* case cited by the Government as "internally inconsistent and ambiguous regarding the extent to which funds are federal funds exempt from attachment." *Id.* at 3 (citing *Capolino*, 2001 WL 487436). Centerpoint further distinguishes *Fulgham*, *Palmiter*, *Neukirchen*, and *Joliet-Will*. *Id.* at 5-9.

The principle distinction, according to Centerpoint, is that when the federal government has previously distributed funds, it retains an interest that prevents attachment. *Id.* at 6. However, Centerpoint sees no authority in the cases for the proposition that attachment is forbidden when a party grants the federal government an interest in the funds, rather than receiving the funds as a distribution. *Id.* Centerpoint asserts that the Government must prove "that Defendants' account contains federal distributions." *Id.*

Centerpoint concedes that Account # 721135392 contains "rental assistance funds" as well as rents paid directly by tenants but disagrees that the rental assistance funds "have retained their nature as federal distributions." *Id.* at 8. This is so, it argues, because "once those funds have been used to pay a tenant's rent, they have been spent for their statutorily-authorized purpose, and are no longer considered federal distributions for attachment purposes." *Id.* Centerpoint views the federal government's beneficial interest in the funds as being an interest in "mak[ing] sure that tenant has a place to stay for that month." *Id.* This interest is satisfied, in Centerpoint's view, when the federal government makes the rental assistance payment to Elsemore Estates.

Centerpoint also denies the Government's argument that a security interest in the account itself exempts the funds from attachment. *Id.* at 9. It further denies that the plaintiff who has obtained attachment can have no greater right over the property than the defendant. *Id.* Finally, it denies that the Penobscot County Superior Court was incorrect to issue an ex parte attachment. *Id.* at 10. It finds

"specious" the Government's contention that the RHS counter-signature requirement rebuts the Superior Court's finding that Norberg and Gleichman could have dispersed the funds without the attachment. *Id.*

### 3. The Government's Reply

The Government first observes that the money in Account # 721135392 was paid directly from the federal government into a bank account belonging to Elsemore Estates. *Intervenor's Reply* at 2-3. The tenants never receive the money directly, and they are not required to repay it. *Id.* at 3. The Government concludes that because "rental assistance payments flow directly from the federal government into the project's operating account, then into the [Elsemore Estates] Reserve Account, the Reserve Account is populated by federal distributions." *Id.* It views these funds as "functionally equivalent to federal grant money." *Id.*

The Government also disputes that the money given as rental assistance has been spent for its intended purpose by the time it arrives in the Elsemore Estates operating account. *Id.* The Government concedes that one purpose of the money is to "fill the gap between what a project tenant pays in rent and the approved shelter cost for the tenant's unit." *Id.* However, it identifies another purpose: to "populate and therefore further the goals of the Reserve Account." *Id.* The purpose of the reserve account is to meet the goals identified in 7 C.F.R. § 3560.306(h)(4), i.e., to pay for capital improvements to the property. *Id.* The Government completes the syllogism, concluding that the funds that flowed from the federal government, to the operating account, and then into the reserve account, are federal funds that have not yet been spent to fulfill their intended purpose. *Id.* at 4.

The Government next defends the applicability of the *Capolino* decision. *Id.* (citing *Capolino*, 2001 WL 487436). It views the case as clear precedent for placing the burden on Centerpoint to prove that the funds in Account # 721135392—which include both rent payments from tenants and rent assistance payments from the federal government—are not federal funds, and therefore not barred from attachment by the Supremacy Clause. *Id.* The Government argues that Centerpoint has not and cannot meet this burden because the funds are intermingled. *Id.*

The Government repeats its earlier arguments that the garnishor stands in the shoes of the judgment debtor and cannot exercise more control over the attached property than could the debtor himself. *Id.* at 5 (citing *Amoco Oil*, 628 F. Supp. at 38). It also repeats its argument that the attachment was improper because the Defendants could not have dissipated the funds without express approval from RHS, which it would not have given for any distribution other than one for the benefit of Elsemore Estates. *Id.* at 5-6.

### B.    Discussion

"[F]ederal monies are not subject to garnishment proceedings until they have been paid out for the purposes for which they were appropriated." *Palmiter*, 733 F.2d at 1247 (citing *Buchanan v. Alexander*, 45 U.S. (4 How.) 20, 20-21 (1846)). The "judgment creditor . . . ha[s] the burden of proving which funds are either not federal or have been finally expended for their statutory purpose." *Id.* at 1248.

This principal is easy to state in the abstract, but it becomes more complex to apply the further the chain of custody and control extends from a federal agency to

13

the entity actually holding the funds. Here, the federal agency—the Rural Housing Service—transferred the money to the Defendants as rental assistance for tenants of Elsemore Estates. The Defendants put the money into the operating bank account for Elsemore Estates. Then, in compliance with their statutory and contractual obligations to RHS, the Defendants transferred a portion of the money into the reserve account, intermingling it with other money reserved from rents paid directly by tenants of Elsemore Estates. The Defendants cannot withdraw money from the reserve account without a counter-signature from RHS, and may only use the money for purposes that RHS approves—primarily capital improvements to and maintenance of Elsemore Estates. The question is whether this makes the money in the reserve account "federal funds," immune from attachment by the defendants' judgment creditor, Centerpoint.

In *Palmiter*, the Seventh Circuit held that funds in the possession of a non-profit community service organization, granted directly from the federal government and indirectly through federally-funded state agencies, were federal funds and not subject to garnishment. *Id.* at 1246-49. It reasoned that the organization's "management of the federal funds . . . was governed by pervasive federal legislation and regulations which specified the purposes for which the funds could be used." *Id.* at 1247. This was so even though the organization received some of the funds as grants from federally-funded state agencies, and in some cases received them as reimbursement for expenses already incurred. *Id.* at 1248-49. The central criteria in the Seventh Circuit's analysis were the ultimate federal

origin of the money and the pervasive control the federal government exercised over its expenditure. *Id.* at 1248-50.

In *Joliet-Will*, the Seventh Circuit applied the same principle to conclude that both funds from federal grants and property purchased with those funds were "assets of the federal government" and therefore not part of a bankruptcy estate. 847 F.2d at 432. The Court's rationale rested on four main points. First, the "grants impose[d] minute controls on the use of the funds, such that the recipient ha[d] very little discretion." *Id.* Second, the grantor-grantee relationship rendered the grantee an agent of the grantor as to the use of the funds. *Id.* Third, the statutes creating the grant programs left very little discretion even in the federal granting agencies. *Id.* Finally, the Court cited *Buchanan* for the proposition that "federal funds in the hands of a grantee remain the property of the federal government unless and until expended in accordance with the terms of the grant." *Id.* The Seventh Circuit extended this principle again in *Neukirchen*, holding that it applied even to grant-funded property that federal regulations permitted the grantee to keep or dispose of when it was no longer needed for grant purposes. 53 F.3d at 812-13.

In the unreported *Capolino* case, a district court in the Southern District of New York held that bank accounts into which the defendant public housing agency had placed "excess rents" actually constituted "federal funds," and were therefore immune from garnishment. 2001 WL 487436, at *5. That Court reasoned that statutory law prohibited the grantee from "transferring any rent . . . [from rents

received from public housing tenants] or in connection therewith" until all debts owed by the agency to the federal grantor were paid. *Id.* (internal quotations omitted). Because the would-be garnishor had not showed that all debts to the federal grantor had been paid, the federal grantor had an "interest in the [f]unds." *Id.* The Court further reasoned that all of the funds at issue—including the excess rents subject to federal "interest"—"are Federal Funds," *id.* at *6, and "[f]ederal [f]unds are not subject to state attachment proceedings." *Id.*[2]

In another unreported case, a district court in the District of Maryland applied *Capolino* to hold that a judgment creditor could not garnish funds held by a housing authority, where the federal grantor disbursed the funds subject to a "right to recapture" if they were used for purposes other than those permitted by regulations. *Fulgham*, 2011 WL 4566447, at *1, 4. The grantee could "not withdraw funds from [the federally]-funded accounts except to pay costs of developing and operating [housing] projects . . . and for other uses that [the federal grantor] specifically approve[d]." *Id.* at *4.

Centerpoint advances three principal arguments for why the funds in Account # 721135392 are not federal funds: first, that they amount to "rents" paid

---

[2]     After the *Capolino* Court determined that the federal grantor had an interest in the funds, the Court's exact language was:

> HUD has established that a portion of the Funds held by the defendant banks are direct federal grants and that it has an interest in the remaining funds. Therefore, HUD has established a likelihood of success on the merits because Federal Funds are not subject to state attachment proceedings without HUD's consent. Moreover, HUD has shown that the Funds in the defendant banks are Federal Funds. HUD has satisfied the requirements for a preliminary injunction, and HUD's motion for a preliminary injunction is therefore granted.

*Capolino*, 2001 WL 487436, at *6.

by the tenants, notwithstanding that RHS paid the money directly to the Defendants; second, that any interest of the federal government was bestowed by the Defendants, not by the nature of the funds as grants; and, third, that the funds have been expended for their statutory purpose.  None of these is persuasive.

The cases teach that three factors can lead to money being immune from garnishment as "federal funds."  These factors, all interrelated, are (1) federal origin, (2) federal interest, and (3) federal control.  When the federal government grants money to a grantee with strings attached, the money is immune to garnishment until it has been spent in accordance with its statutory purpose. *Joliet-Will*, 847 F.2d at 432; *Palmiter*, 733 F.2d at 1248.  This principle extends to property purchased with federal funds and subject to federal control.  *Neukirchen*, 53 F.3d at 812-13.  Even funds that do not directly originate from the federal government, such as excess rent payments in a federally-funded housing project, can be "federal funds" if the federal agency exercises sufficient control over their use and disposition, *Capolino*, 2001 WL 487436, at *4-5, and when the federal government has a beneficial interest in the funds, they are also "federal funds" for this purpose.  *Joliet-Will*, 847 F.2d at 432.

Applying these factors to the funds in Account # 721135392 reveals that they are federal funds, not yet expended for their statutory purpose.  First, the Court is dubious as to Centerpoint's argument that the rental assistance payments are somehow not of federal origin; the money flowed from RHS to the Defendants, despite the fact that its underlying purpose was to fulfill RHS's mandate to help low

income tenants. However, even assuming that this money amounts to "rent" paid by the tenants themselves, the federal government retains "minute controls on the use of the funds." *Joliet-Will*, 847 F.2d at 432; *see also Capolino*, 2001 WL 487436, at *4-5. The Defendants were obliged by regulation and contract to place money into the reserve account and to only use it for capital improvements and maintenance at Elsemore Estates. This reflects both "minute control" over the funds and also the statutory purpose of the funds. RHS must counter-sign on any withdrawal, and the Defendants are not permitted to expend the money except for a limited, enumerated set of circumstances. This demonstrates further "minute control."

The government also has several interests in the funds. First, the USDA holds a formal security interest and a mortgage on the property. More importantly, the entire purpose of RHS's control over the reserve account is, quite naturally, to accomplish RHS's statutory mission. The federal interest at stake here is to assure "affordable, decent, safe, and sanitary housing" for the tenants. 7 C.F.R. § 3560.103(a)(3).

It would violate the spirit of the *Buchanan* principle to permit a judgment creditor to attach funds (1) over which a federal agency has detailed, pervasive control; (2) in which the government possesses a formal security interest; and (3) the purpose of which is to serve an important federal interest. This is so even if the funds are several steps removed from their federal origin. *See Palmiter*, 733 F.2d at 1247 (observing that the community service organization holding the disputed

funds was "only one link in the bureaucratic chain necessary to move funds from the United States Treasury to local communities").

Federal grant funds are only immune from attachment until they have been spent for their statutory purpose. *Buchanan*, 45 U.S. at 20-21. The federal funds in Account # 721135392 were intended to be used for the purpose of performing capital improvements to Elsemore Estates. Indeed, Centerpoint's attachment of the funds also froze important rehabilitation work involving much-needed repairs to the housing units that was being funded by the money in Account # 721135392. Under these circumstances, the Court concludes that the funds in Account # 721135392 have not yet been expended for their statutory purpose.

In sum, because the funds in Account # 721135392 are federal funds that have not yet been expended for their statutory purpose, the Court concludes that Centerpoint may not attach the bank account to satisfy its judgment.

## IV.     THE MOTION FOR DEFAULT JUDGMENT

In *Key Bank v. Tablecloth Textile Co.,* 74 F.3d 349 (1st Cir. 1996), the First Circuit discussed the circumstances under which a party who has not formally entered a written appearance is nonetheless entitled to notice of a Rule 55(b)(2) default judgment. The Court stated that "[a]lthough appearance in an action typically involves some presentation or submission to the court—a feature missing here—we have held that a defaulting party 'has appeared' for Rule 55 purposes if it has 'indicated to the moving party a clear purpose to defend the suit.'" *Id.* at 353 (quoting *Muñiz v. Vidal*, 739 F.2d 699, 700 (1st Cir. 1984)). Centerpoint's

Complaint, Motion for Default Judgment, and supporting documents do not mention any contact that it has had with the Defendants before or after initiating this Complaint. *See Decl. Upon Removal of Action* Attach. 18 *Complaint* (ECF No. 4); *Pl.'s Request for Entry of Default J.* (ECF No. 12); *Pl.'s Request for Entry of Default J.* Attach. 1 *Aff. of David A. Eide, Esq.* (ECF No. 12). In view of *Key Bank*, this Court will require Centerpoint within seven days of the date of this Order to select between the following:

(1) request the scheduling of a damages hearing and give the Defendants formal notice of the hearing in accordance with Federal Rule of Civil Procedure 55(b)(2), *see Reynolds v. Bar Harbor Whale Watch Co.*, Civil No. 00-102-B-H, 2001 WL 26205, at *2 (D. Me. Jan. 9, 2001) ("On October 26, 2000, Plaintiff's counsel attempted to notify the defaulted Defendant of the impending damages hearing"); or,

(2) file a new Affidavit setting forth facts sufficient for this Court to conclude that the First Circuit's concerns in *Key Bank* have been satisfied, and rest on the previously filed Affidavits in lieu of a damages hearing.

## V. CONCLUSION

The Court GRANTS the Government's Motion to Dissolve Attachment (ECF No. 17), and ORDERS Centerpoint, within seven days, to either schedule a damages hearing with notice to the Defendants or file a new Affidavit representing that Centerpoint has complied with *Key Bank*.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 14th day of April, 2014